# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| MARTA SHUMYLO, INDIVIDUALLY, AND A.K., a minor (DECEASED), BY AND THROUGH HEIR, MARTA SHUMYLO, NATALIIA NIKITSKA, INDIVIDUALLY, AND D.N., a minor (DECEASED), BY AND THROUGH HEIR NATALIIA NIKITSKA, VALENTINA TSVITOK, INDIVIDUALLY, AND T.T., a minor (DECEASED), BY AND THROUGH HEIR, VALENTINA TSVITOK, | § § § § § § § § § § § § § | CIVIL ACTION NO. 3:25-CV-03400-D (Consolidated for Pretrial Purposes Only With Civil Action Nos. 3:25-CV-3402-D, 3:25-CV-3403-D, 3:25-CV-3406-D, and 3:25-CV-3416-D) |
| *Plaintiffs,* | | |
| v. | § § | |
| TEXAS INSTRUMENTS INCORPORATED, ADVANCED MICRO DEVICES, INC., INTEL CORPORATION, MOUSER ELECTRONICS, INC., and DOES 1-100, | § § § § § § | |
| *Defendants.* | § § § | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................2

        A.      Plaintiffs' Factual Allegations.................................................................2

        B.      Plaintiffs' Reliance on Federal Export-Control Laws and Foreign Policy ..............4

        C.      Plaintiffs' Texas State Claims .................................................................4

        D.      Constitutional, Statutory, and Regulatory Framework ............................5

III.    LEGAL STANDARD ............................................................................................8

IV.     FEDERAL LAW PREEMPTS PLAINTIFFS' CLAIMS ......................................8

        A.      Field Preemption Bars Plaintiffs' Claims, Because States May Not
                Regulate in the Field of Export Controls ................................................9

                1.      State Law May Not "Take a Position on a Matter of Foreign Policy
                        with No Serious Claim to be Addressing a Traditional State
                        Responsibility".............................................................................9

                2.      Through Export-Control Laws and the EAR, the Federal
                        Government Has Preempted the Field of Export Controls ........12

        B.      Plaintiffs' Tort Theories Conflict with Federal Law .............................14

                1.      Plaintiffs Cannot Use State Law to Enforce Federal Laws,
                        Undermining the President's Authority .....................................14

                2.      Plaintiffs Cannot Impose Export-Control Requirements that Differ
                        from Federal Requirements........................................................17

V.      PLAINTIFFS' CLAIMS FAIL AS PLEADED, UNDER TEXAS LAW .........................20

        A.      Plaintiffs Do Not Plead Facts Essential to Causation (All Counts)......................20

        B.      U.S. Export Controls Create No Private Right of Action, Defeating
                Negligence-Per-Se, Conspiracy, and Joint-Enterprise Claims (Counts 3, 5,
                8) .............................................................................................................23

                1.      Statutes Without a Private Right of Action Cannot Support a
                        Negligence-Per-Se Claim (Count 3) ..........................................24

                2.      Absent Any Underlying Tort, Plaintiffs' Conspiracy and Joint-
                        Enterprise Claims Also Fail (Counts 5, 8) .................................25

        C.      Plaintiffs Plead No Cognizable Duty Supporting Negligence or Gross
                Negligence Claims (Claims 1, 2, 3, 4).....................................................27

        D.      Plaintiffs' Allegations Are Factually and Legally Deficient in Other
                Respects (Counts 5–10) ..........................................................................29

E.      All Claims Brought by the *Tereschenko*, *Zaplyvanyi*, and *Babich* Plaintiffs Are Time-Barred. ......................................................................................32

VI.    CONCLUSION..................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Adams v. Alcolac, Inc.*,
    974 F.3d 540 (5th Cir. 2020) ......................................................................24, 26, 27

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) .........................................................................................23

*Allen v. Walmart Stores, L.L.C.*,
    907 F.3d 170 (5th Cir. 2018) ...........................................................................28

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) .............................................................................1, 9, 10, 15

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................. passim

*Armstrong v. Sw. Airlines Co.*,
    No. 3:20-CV-3610-BT, 2021 WL 4391247 (N.D. Tex. Sept. 24, 2021) ...........................24, 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. passim

*Audler v. CBC Innovis Inc.*,
    519 F.3d 239 (5th Cir. 2008) ...........................................................................27

*Beckwith v. City of Hou.*,
    790 F. App'x 568 (5th Cir. 2019) (per curiam) ...........................................................34

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................................8

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) .........................................................................................14

*Brighthouse Life Ins. Co. v. Daboub*,
    577 F. Supp. 3d 504 (N.D. Tex. 2021) .................................................................24

*Bryant v. CIT Grp./Consumer Fin., Inc.*,
    303 F. Supp. 3d 515 (S.D. Tex. 2018) .................................................................33

*Buckman Co. v. Plaintiffs' Legal Committee*,
    531 U.S. 341 (2001) ...........................................................................15, 16, 17, 22

*Cali-Curl, Inc. v. Marianna Indus., Inc.*,
    No. 3:23-CV-320-K, 2023 WL 6452379 (N.D. Tex. Oct. 3, 2023) .......................................31

*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992)..................................................................................................................8

*Cleveland State Bank v. JPMorgan Chase Bank*,
    No. 4:24-CV-1600, 2025 WL 296144 (S.D. Tex. Jan. 24, 2025)............................................29

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)......................................................................................... passim

*In re DePuy Ortho., Inc. Pinnacle Hip Implant Prod. Liab. Litig.*,
    888 F.3d 753 (5th Cir. 2018) ................................................................................................29

*Dmytrivna, et al. v. Texas Instruments, Inc., et al.*,
    No. 25-CV-3406 ....................................................................................................................3

*Doe v. City View Ind. Sch. Dist.*,
    736 F. Supp. 3d 459 (S.D. Tex. 2024) .............................................................................33, 35

*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d 333 (5th Cir. 2008) ................................................................................................21

*Eller v. Trans Union LLC*,
    No. 09-CV-0040-WJM-KMT, 2012 WL 786283 (D. Colo. Mar. 9, 2012)............................19

*In re ESO Solutions, Inc. Breach Litig.*,
    23-CV-1557-RP, 2024 WL 4456703 (W.D. Tex. July 30, 2024)...........................................25

*Fed. Express Corp. v. United States Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022)...............................................................................................11

*Florida Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963)................................................................................................................9

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000).....................................................................................................2, 9, 18

*In re Great Lakes Dredge & Dock Co. LC*,
    624 F.3d 201 (5th Cir. 2010) ................................................................................................23

*Heckler v. Chaney*,
    470 U.S. 821 (1985)..............................................................................................................12

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)......................................................................................................9, 12, 14

*Johnson v. Tyson Foods, Inc.*,
    580 F. Supp.3d 382 (N.D. Tex. 2022) ...................................................................................23

*Johnson v. United States*,
   No. 3:06-CV-1418-P, 2007 WL 9711680 (N.D. Tex. Aug. 29, 2007) .................................... 33

*Karahalios v. Nat'l Fed'n of Fed. Emps. Loc. 1263*,
   489 U.S. 527 (1989) ........................................................................................................ 24

*In re Katrina Canal Breaches Litig.*,
   495 F.3d 191 (5th Cir. 2007) ........................................................................................... 8

*Lowman v. Enter. Fin. Grp., Inc.*,
   No. 3:24-CV-02752-L, 2025 WL 2778380 (N.D. Tex. Sep. 30, 2025) ................................ 25

*Marlin v. Moody Nat'l Bank N.A.*,
   No. H-04-4443, 2006 WL 2382325 (S.D. Tx. Aug. 16, 2006) ............................................ 27

*Martinez v. Walgreen Co.*,
   935 F.3d 396 (5th Cir. 2019) .......................................................................................... 25

*Martone v. Livingston*,
   No. 4:13-CV-3369, 2015 WL 9259089 (S.D. Tex. Dec. 18, 2015) ..................................... 32

*Maryland v. Louisiana*,
   451 U.S. 725 (1981) ......................................................................................................... 8

*McGowan v. S. Methodist Univ.*,
   715 F. Supp. 3d 937 (N.D. Tex. 2024) ........................................................................ 34, 35

*Midwestern Cattle Mktg., LLC v. Legend Bank, N.A.*,
   800 F. App'x 239 (5th Cir. 2020) .................................................................................... 29

*Milam v. Jimerson*,
   152 F.4th 678 (5th Cir. 2025) ........................................................................................... 8

*Mortberg v. Litton Loan Servicing, L.P.*,
   No. 4:10-CV-668, 2011 WL 4431946 (E.D. Tex. Aug. 30, 2011) ...................................... 27

*Movsesian v. Victoria Versicherung AG*,
   670 F.3d 1067 (9th Cir. 2012) ......................................................................................... 11

*National Foreign Trade Council v. Natsios*,
   181 F.3d 38 (1st Cir. 1999) ......................................................................................... 10, 11

*Naylor v. Crush 72, Inc.*,
   No. 4:24-CV-634-Y, 2025 WL 1250917 (N.D. Tex. Apr. 24, 2025) ................................... 25

*Neukranz v. Conestoga Settlement Servs., LLC*,
   No. 3:19-CV-1681-L, 2022 WL 19518462 (N.D. Tex. Nov. 23, 2022) ................................ 30

*In re New Era Enters. Inc. Data Incident Litig.*,
   No. H-25-732, 2026 WL 303547 (S.D. Tex. Feb. 4, 2026)......................................................25

*New Mexico v. Gen. Elec. Co.*,
   467 F.3d 1223 (10th Cir. 2006) .............................................................................................19

*Niss v. Nat'l Ass'n of Sec. Dealers, Inc.*,
   989 F. Supp. 1302 (S.D. Cal. 1997)........................................................................................28

*Oubre v. Schlumberger Ltd.*,
   No. 3:15-CV-111, 2016 WL 5334627 (S.D. Tex. Sept. 23, 2016)...........................................33

*R.J. Reynolds Tobacco Co. v. Durham Cnty., N.C.*,
   479 U.S. 130 (1986).................................................................................................................13

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947)...................................................................................................................9

*Rodgers v. Lancaster Police & Fire Dep't*,
   819 F.3d 205 (5th Cir. 2016) ..................................................................................................32

*Rodriguez v. Xerox Bus. Servs, LLC*,
   No. EP-16-CV-00041-FM, 2017 WL 3023213 (N.D. Tex. Mar. 27, 2017)............................20

*Simmons v. Peavy-Welsh Lumber Co.*,
   113 F.2d 812 (5th Cir. 1940) ..................................................................................................21

*Singleton v. Harris Cty.*,
   752 F. Supp.3d 672 (S.D. Tex. 2024) ......................................................................................32

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
   605 U.S. 280 (2025).................................................................................................................30

*Smith v. Am. Pain & Wellness, PLCC*,
   747 F. Supp. 3d 989 (E.D. Tex. 2024).....................................................................................25

*Tornado BUS Co. v. BUS & Coach Am. Corp.*,
   No. 3:14-cv-3231-M, 2015 WL 11120584 (N.D. Tex. Dec. 15, 2015)...................................30

*Twitter Inc. v. Taamneh*,
   598 U.S. 471 (2023).................................................................................................................30

*United States v. Locke*,
   529 U.S. 89 (2000)...................................................................................................................18

*United States v. Nixon*,
   418 U.S. 683 (1974).................................................................................................................16

*United States v. Pink*,
315 U.S. 203 (1942)................................................................................................1, 9

*United States v. St. Luke's Episcopal Hosp.*,
355 F.3d 370 (5th Cir. 2004) ......................................................................................21

*United States v. Trump*,
603 U.S. 593 (2024)....................................................................................................16

*Walters v. Blue Cross & Blue Shield of Tex., Inc.*,
No 21-CV-981-L, 2022 WL 902735 (N.D. Tex. Mar. 28, 2022) ......................................24, 25

*Williams v. Wal-Mart Stores Texas LLC*,
No. 4:24-cv-00583-P, 2024 WL 4668556 (N.D. Tex. Nov. 4, 2024)....................................20

*Wisc. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
475 U.S. 282 (1986)....................................................................................................16

*Zschernig v. Miller*,
389 U.S. 429 (1968)................................................................................................10, 11

**STATE CASES**

*Agar Corp. v. Electro Circuits Int'l, LLC*,
580 S.W.3d 136 (Tex. 2019)..............................................................................25, 26, 33

*Allred v. Freestone Cnty. Fair Ass'n, Inc.*,
No. 07-20-00168-CV, 2022 WL 1153152 (Tex. App.—Amarillo Apr. 18,
2022) ......................................................................................................................31

*Austin Nursing Ctr., Inc. v. Lovato*,
171 S.W.3d 845 (Tex. 2005)........................................................................................32

*Childs v. Haussecker*,
974 S.W.2d 31 (Tex. 1998)..........................................................................................33

*Chu v. Hong*,
249 S.W.3d 441 (Tex. 2008)....................................................................................26, 27

*E-Learning LLC v. AT&T Corp.*,
517 S.W.3d 849 (Tex. App.—San Antonio 2017)..............................................................31

*Elephant Ins. Co. v. Kenyon*,
644 S.W.3d 137 (Tex. 2022)........................................................................................28

*Gaulding v. Celotex Corp.*,
772 S.W.2d 66 (Tex. 1989)..........................................................................................20

*Greater Hous. Transp. Co. v. Phillips*,
  801 S.W.2d 523 (Tex. 1990)..................................................................................28

*Hooks v. Samson Lone Star, L.P.*,
  457 S.W.3d 52 (Tex. 2015)...................................................................................35

*Hou. Area Safety Council, Inc. v. Mendez*,
  671 S.W.3d 580 (Tex. 2023)................................................................................29

*In re Luminant Generation Co. LLC*,
  711 S.W.3d 13 (Tex. App.—Houston 2023) .........................................................29

*Mullins v. McWhirter*,
  724 S.W.3d 571 (Tex. App.—Eastland 2025).......................................................19

*Nguyen v. Watts*,
  605 S.W.3d 761 (Tex. App.—Houston 2020) .......................................................33

*Pagayon v. Exxon Mobil Corp.*,
  536 S.W.3d 499 (Tex. 2017)................................................................................28

*Reeder v. Daniel*,
  61 S.W.3d 359 (Tex. 2001)..................................................................................25

*Roxo Energy Co., LLC v. Baxsto, LLC*,
  713 S.W.3d 404 (Tex. 2025)................................................................................31

*Ruiz v. Guerra*,
  293 S.W.3d 706 (Tex. App.—San Antonio 2009)................................................33

*Russell v. Ingersoll-Rand Co.*,
  841 S.W.2d 343 (Tex. 1992)................................................................................32

*Schlumberger Tech. Corp. v. Pasko*,
  544 S.W.3d 830 (Tex. 2018)................................................................................32

*SCI Tex. Funeral Servs., Inc. v. Hijar*,
  214 S.W. 3d 148 (Tex. App.—El Paso 2007).......................................................26

*Smith v. Merritt*,
  940 S.W. 2d 602 (Tex. 1997)..........................................................................24, 25

*St. Joseph Hosp. v. Wolff*,
  94 S.W.3d 513 (Tex. 2002)..................................................................................31

*In re Tex. Dep't of Transp.*,
  218 S.W.3d 74 (Tex. 2007)..................................................................................33

*Trammell Crow Cent. Tex., Ltd. v. Gutierrez*,
   267 S.W.3d 9 (Tex. 2008)......................................................................................2, 28

*Trevino v. Ortega*,
   969 S.W.2d 950 (Tex. 1998)........................................................................................25

**FEDERAL STATUTES**

22 U.S.C. § 2778(c) ............................................................................................................7, 24

50 U.S.C. § 1701...........................................................................................................6, 12, 17

50 U.S.C. § 1702.......................................................................................................................17

50 U.S.C. § 1705............................................................................................................7, 17, 19

50 U.S.C. § 4812(b) .................................................................................................................11

50 U.S.C. § 4819........................................................................................................... passim

CHIPS and Science Act of 2022, Pub. L. 117–167, 136 Stat. 1366 (Aug. 2022) .........................19

Napoleonic Wars, Embargo Act of 1807, Pub. L. 10-5, 2 Stat. 451...................................6

**STATUTES - OTHER**

Tex. Civ. Prac. & Rem. Code § 16.003(a)........................................................................32

Tex. Civ. Prac. & Rem. Code § 71.004(b)........................................................................32

Tex. Civ. Prac. & Rem. Code § 71.031(a)........................................................................33

**FEDERAL REGULATIONS**

15 C.F.R. § 730.2.......................................................................................................................6

15 C.F.R. § 734.2.....................................................................................................................13

15 C.F.R. § 738.2.....................................................................................................................13

15 C.F.R. § 738.3.....................................................................................................................13

15 C.F.R. § 738.4.....................................................................................................................13

15 C.F.R. § 744.21(a)(2)........................................................................................................18

15 C.F.R. § 772.1.....................................................................................................................19

31 C.F.R. § 560.701...........................................................................................................7, 24

31 C.F.R. § 587.701 ............................................................................................................7, 24

31 C.F.R. § 589.701 ........................................................................................................6, 7, 12

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 3,................................................................................................5

U.S. Const. art. I, § 8, cl. 10.................................................................................................5

U.S. Const. art. I, § 8, cl. 11.................................................................................................5

U.S. Const. art. I, § 10, cl. 1.................................................................................................5

U.S. Const. art. I, § 10, cl. 2.................................................................................................5

U.S. Const. art. II, § 10, cl. 1 ..............................................................................................5

U.S. Const. art. II, § 10, cl. 2 ..............................................................................................5

U.S. Const. art. II, § 10, cl. 3 ..............................................................................................5

## TREATISES

*Restatement (Second) of Torts* § 315 ....................................................................................28

## OTHER AUTHORITIES

The Insider, *U.S. Parts Routed Via Shell Networks* (Jan. 25, 2023)
    https://theins.ru/en/politics/258850..............................................................................22

Olena Bilousova, Nataliia Shapoval & Vladyslav Vlasiuk, *Working Group Paper
    #13: Strengthening Sanctions on Foreign Components in Russian Military
    Drones*, Int'l Working Grp. on Russian Sanctions (Aug. 23, 2023)
    https://sanctions.kse.ua/wpcontent/uploads/2023/09/sanctions_workingbgroup
    _drones_final4.pdf .......................................................................................................21

Reuters, *As Russian missiles struck Ukraine, Western tech still flowed* (Aug. 8,
    2022)  https://www.reuters.com/investigates/specialreport/ukraine-crisis-
    russia-missiles-chips/ ...................................................................................................22

Royal United Services Institute, *Silicon Lifeline: Western Electronics at the Heart
    of Russia's War Machine - Interactive Summary*, (last visited Mar. 20, 2026)
    ("RUSI")
    https://sanctions.kse.ua/wpcontent/uploads/2023/09/sanctions_workingbgroup
    _drones_final4.pdf .......................................................................................................21

## I.    INTRODUCTION

These lawsuits ask the Court to do something essentially unprecedented in American tort law: hold American manufacturers liable—under Texas state law—for foreign military operations they had no role in planning or executing.  Plaintiffs are Ukrainian citizens injured by Russian military airstrikes in Ukraine, who now claim that American semiconductor companies are responsible for their injuries.  Their central allegation is that Defendants sold and distributed semiconductors—coin-sized computer components used worldwide, in laptops, cars, household appliances, and elsewhere—that were diverted at some unknown point by some unknown person for use in Russian weapons.  By failing to prevent this diversion, Defendants allegedly breached a Texas-state tort duty owed by all American companies to the citizens of Ukraine—a duty based on U.S. foreign sanctions, export-control laws, and foreign policy.

American semiconductor companies are not liable for the Russian military's attacks, and Plaintiffs cannot use Texas law to privately enforce federal export-control laws and foreign policy.  As a result—for multiple overlapping reasons—Plaintiffs' claims fail.

*First*, federal law preempts Plaintiffs' claims.  (*Infra* § IV.)  "Power over external affairs is not shared by the States; it is vested in the national government exclusively."  *United States v. Pink*, 315 U.S. 203, 233 (1942).  As a result, states may not regulate in the field of export controls—yet Plaintiffs use Texas tort law to do just that, "tak[ing] a position on a matter of foreign policy" divorced from any "traditional state responsibility."  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003).  (*Infra* § IV(A).)  In addition, Plaintiffs' tort theories conflict with federal law.  Particularly in areas that touch on "foreign relations," states cannot use state law to punish alleged violations of federal law without treading on the Executive Branch's discretion and undermining the President's ability to "speak for the Nation with one voice[.]"  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375, 381 (2000); *accord Arizona v. United*

1

*States*, 567 U.S. 387, 399 (2012).  This conflict-preemption rule applies to applications of state tort law, and it also prohibits Plaintiffs' claims.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 874 (2000).  (*Infra* § IV(B).)

*Second*, even taking Plaintiffs' claims at face value—pleaded under Texas law—Plaintiffs have not alleged facts supporting a "reasonable inference that the [Defendants are] liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  (*Infra* § V.)  For example, Plaintiffs have not plausibly pleaded causation.  They neither plead facts showing *which* semiconductors were in the specific weapons that injured Plaintiffs, nor that export-control violations had anything to do with Russia acquiring those components.  (*Infra* § V(A).)  As the Petitions show, many different companies from many different countries make semiconductors that have been found in Russian munitions, and Russia also had legal access to those components before stringent U.S. export restrictions went into effect in 2022.  In addition, Plaintiffs premise several tort claims on direct violations of federal export-control laws, which provide for no private cause of action.  (*Infra* § V(B).)  And, contrary to Texas law, Plaintiffs impermissibly seek to hold Defendants liable for failing to "protect others from third-party criminal acts."  *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 12 (Tex. 2008).  (*Infra* § V(C).)

Defendants deeply sympathize with Plaintiffs.  But the avenue for Ukrainian citizens to pursue justice for Russian military airstrikes is not in U.S. courts, under Texas tort law, against American semiconductor companies.  These cases must be dismissed.

## II.   BACKGROUND

### A.    Plaintiffs' Factual Allegations

Intel, Advanced Micro Devices ("AMD"), and Texas Instruments ("TI") are American companies that design and sell semiconductors—computer components used worldwide, in

laptops, cars, household appliances, and elsewhere.[1]  Mouser Electronics distributes semiconductors (among other products), including those designed by Intel, AMD, and TI.

According to their Petitions, Plaintiffs are Ukrainian citizens now "living abroad" who were "injured or killed" (or whose relatives were injured or killed) in Russian military airstrikes, which occurred in different Ukrainian cities on March 22, 2023 (*Tereschenko* Pet. ¶ 187), April 28, 2023 (*Zaplyvanyi* Pet. ¶ 189), June 13, 2023 (*Babich* Pet. ¶ 185), July 8, 2024 (*Dmytrivna* Pet. ¶ 181), and April 4, 2025 (*Shumylo* Pet. ¶ 184).[2]

Plaintiffs allege that Intel, AMD, and TI products have been previously found in the types of weapons used in Russian airstrikes—Shahed drones, KH-101 missiles, and Iskander-M missiles.  (Pet. ¶¶ 164–67.)  But Plaintiffs do not allege (except on bare "information and belief") that the specific munitions used in the attacks on Plaintiffs contained Defendants' semiconductors.  (Pet ¶ 194.)

Plaintiffs plead no facts establishing that a violation of U.S. export-control laws led Russia to acquire any of the semiconductors at issue.  Plaintiffs do not allege that AMD, Intel, TI, or Mouser sold any semiconductors directly to the Russian government or its proxies after Russia invaded Ukraine.  Instead, they allege that the Defendants' products were "diverted."

---

[1] AMD is a fabless design company, meaning that it does not manufacture its own semiconductors.  For convenience, this brief occasionally refers to all three companies as "manufacturers."

[2] References to "Pet." are to Plaintiffs' Original Petition and Jury Demand in *Shumylo et al. v. Texas Instruments, Inc., et al,*, No. 25-CV-3400, Docket No. 1, Exhibit C.  Where allegations among the five cases are identical, *Shumylo* is used as the exemplar.  When relevant, other petitions are cited individually: *Zaplyvanyi et al. v. Texas Instruments, Inc. et al.*, No. 25-CV-3402, Docket No. 1, Exhibit C ("*Zaplyvanyi* Pet."); *Babich, et al. v. Texas Instruments, Inc., et al.*, No. 25-CV-3403, Docket No. 1, Exhibit C ("*Babich* Pet."); *Dmytrivna, et al. v. Texas Instruments, Inc., et al.*, No. 25-CV-3406, Docket No. 1, Exhibit C ("*Dmytrivna* Pet."), and *Tereschenko, et al. v. Texas Instruments, Inc., et al.*, No. 25-CV-3416, Docket No. 1, Exhibit C ("*Tereschenko* Pet.").

3

(*E.g.*, Pet. ¶ 171.)  Plaintiffs do not allege any chain of specific transactions that led to Defendants' products being used (if at all) in the specific Russian military attacks at issue.

### B.      Plaintiffs' Reliance on Federal Export-Control Laws and Foreign Policy

Although nominally pleaded under Texas law, the foundation of Plaintiffs' claims is federal export-control law and U.S. foreign policy towards Ukraine.  Plaintiffs allege in great detail—for nearly 20 pages of their Petitions—how these federal laws created "a common-law duty of care" owed by Defendants to Plaintiffs.  (Pet. § VII(A) and ¶¶ 69–112.)  Specifically, Plaintiffs allege that "Defendants owe a common-law duty of care to Plaintiffs based on" (1) "the United States' longstanding foreign policy to protect the Ukrainian people and to ensure that US-weapons are not used against the Ukrainian people" (Pet. ¶ 69); (2) "the United States' laws and regulations on exports and sanctions that prevent Defendants from selling semiconductor components and technology to Iran" (Pet. ¶ 83); and (3) "the United States' laws and regulations on exports and sanctions that prevent Defendants from selling semiconductor components and technology to Russia" (Pet. ¶ 90).  After these extensive allegations, Plaintiffs also—in just five paragraphs—cite general statements from the Texas governor and Dallas officials condemning the war in Ukraine.  (Pet. ¶¶ 114–118.)

### C.      Plaintiffs' Texas State Claims

Despite the centrality of federal export-control laws and foreign policy to their claims, Plaintiffs bring ten different counts exclusively under Texas state law.  In Counts 1–3, Plaintiffs plead negligence and negligence-per-se, based on Defendants' alleged breach of duties related to "compliance and export-control systems" (Pet. ¶¶ 210, 216) and "U.S. export-control and sanctions regulations" (Pet. ¶ 222).  In Count 4, Plaintiffs allege that Defendants were grossly negligent, because they "fail[ed] to implement effective compliance measures" despite "actual, subjective awareness of an extreme degree of risk" to Ukrainians if semiconductor components

4

were "diverted into Russian and Iranian weapons systems." (Pet. ¶¶ 225–26.) In Counts 5 and 6, Plaintiffs allege that Defendants also "conspired . . . to evade and/or violate U.S. export laws" (Pet. ¶ 230) and aided and abetted the "Russian military's conduct" by "act[ing] . . . to evade and/or violate U.S. export laws" (Pet ¶¶ 236–37). In Count 7, Plaintiffs allege that Defendants fraudulently concealed their conduct from "regulatory authorities" and other third parties. (Pet ¶ 247.) And in Count 8, Plaintiffs allege that Defendants had an illegal "joint enterprise" to "collaborate in the illegal export of missile-critical component parts to Russia." (Pet. ¶ 251.) On behalf of injured or deceased relatives, some Plaintiffs also bring wrongful-death and survival claims. (Counts 9–10, Pet. ¶¶ 258–76.)

### D.   Constitutional, Statutory, and Regulatory Framework

As Plaintiffs' allegations reflect, their tort claims implicate U.S. sanctions and export controls exclusively established by Congress and the President.

The Constitution grants the Legislative and Executive Branches of the federal government power over foreign relations—including commerce and exports—and generally excludes states from that area. The Legislative Branch has plenary power to regulate foreign commerce, to "provide for the common Defence . . . of the United States," to "punish . . . Offences against the Law of Nations," and to "declare War." U.S. Const. art. I, § 8, cl. 3, 10, 11. The Constitution likewise empowers the President—with advice and consent of the Senate—"to make Treaties" and to "appoint Ambassadors. *Id.* art. II, § 2, cl. 2. By contrast, the States may not "enter into any Treaty, Alliance, or Confederation" or—without the consent of Congress— "lay any Imposts or Duties on Imports or Exports" or "enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War." *Id.* art. I, § 10, cl. 1, 2, 3.

Beginning with the Continental Congress's prohibition on exports to Britain, Articles of Association (Oct. 20, 1774), and Thomas Jefferson's total prohibition on exports during the

5

Napoleonic Wars, Embargo Act of 1807, Pub. L. 10-5, 2 Stat. 451, the federal government has long exercised its authority over exports to influence foreign policy.

Today, multiple interlocking and overlapping statutes define the President's authority over export controls—the most important of which are the International Emergency Economic Powers Act ("IEEPA"), passed in 1977, and the Export Controls Reform Act of 2018 ("ECRA"). IEEPA authorizes the President to regulate U.S. exports, freeze foreign assets, and impose sanctions in response to any "unusual and extraordinary threat" to the national security, foreign policy, or economy of the United States.  50 U.S.C. §§ 1701(a), 1702.  In response to such threats, the President unilaterally can impose sanctions and export controls, including by investigat[ing], regulat[ing], or prohibit[ing] . . . any transactions in foreign exchange." *Id.* § 1702(a)(1); *see also id.* § 1704 (authorizing necessary regulations).  ECRA permits the Executive Branch to restrict exports without the declaration of an emergency required by IEEPA. *See id.* §§ 4811, 4812.  ECRA directs the Secretary of Commerce "to restrict the export of items" (i) that "would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States[,]" and (ii) as "necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations." *Id.* § 4811; *see id.* §§ 4812–4813.

Together, IEEPA and ECRA provide the statutory authority for the Export Administration Regulations ("EAR")—the nation's primary export-control regulations. *See* 15 C.F.R. § 730.2.  Those regulations, administered by the Commerce Department's Bureau of Industry and Security ("BIS") regulate the export of commercial goods with potential military or other prohibited applications as well as legitimate uses. *Id.* § 730.3.  Such "dual-use" items include parts like semiconductors. *Id.*  The regulations are massively complicated and detailed—

6

with dozens of parts and sub-parts, charts, and lists that agencies and businesses use to identify whether a particular product may be exported to a particular purchaser and under what conditions. *See id.* Chapter VII, Subchapter C – Export Administration Regulations; *see, e.g., id.* § 738.2 (Commerce Control List); *id.* § 738.3 (Commerce Country Chart). Other agencies, like the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), also issue sanctions regulations pursuant to IEEPA or other similar statutes.

Exercising authority under these and other export-control statutes, presidents have routinely used international sanctions and export controls in carrying out their international trade, foreign-policy, and national-security agendas. For example, as Plaintiffs allege, Presidents have used their authority to "bar companies in the United States from selling semiconductor components and other technology to Iran and Iranian companies, for the purpose of promoting U.S. foreign policy." (Pet. ¶ 76.) Similarly, "[a]fter Russia invaded Ukraine in 2014," the President imposed sanctions and export controls to "emphasize that Russia's actions . . . constituted a direct assault on international law and regional stability." (Pet. ¶ 78.) More recently, the President similarly used orders pursuant to IEEPA to "operationalize[] the U.S. government's strategy of economic and diplomatic pressure to defend Ukraine." (Pet. ¶ 79.) And "[a]fter Russia's 2022 invasion of Ukraine," BIS expanded the EAR to "impose new export controls on advanced computing integrated circuits, computer commodities containing such integrated circuits, and certain semiconductor manufacturing items." (Pet. ¶ 101.)

None of these laws or regulations provides a private right of action. *See, e.g.*, 31 C.F.R. § 560.701 (Iranian Transaction and Sanctions Regulations); 31 C.F.R. § 589.701 (IEEPA); 50 U.S.C. § 4819 (EAR); 22 U.S.C. § 2778(c) (Arms Export Control Act); 31 C.F.R. § 587.701 (Russian Harmful Foreign Activities Sanctions Regulations); 50 U.S.C. § 1705. The Executive

7

Branch alone has the discretion to enforce these rules, through criminal prosecution and civil penalties.

## III.     LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), taking "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff," *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).  But "the court does not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Milam v. Jimerson*, 152 F.4th 678, 682 (5th Cir. 2025).  Labels, conclusions, and naked assertions without "factual enhancement" are insufficient.  *Twombly*, 550 U.S. at 555, 557.

A claim is plausible only when a plaintiff pleads sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that "do[es] not permit the court to infer more than the mere possibility of misconduct" is insufficient.  *Id.*

## IV.     FEDERAL LAW PREEMPTS PLAINTIFFS' CLAIMS

Federal law preempts all of Plaintiffs' claims.  Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land[.]" Art. VI, cl. 2.  "[S]tate law that conflicts with federal law is 'without effect.'"  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981)).

Implied preemption—the type relevant here—arises in two circumstances.  First, field preemption precludes states "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Arizona*, 567 U.S. at 399.  "The intent to displace state law altogether can be inferred from a framework of

8

regulation 'so pervasive . . . that Congress left no room for the States to supplement it" or where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Second, "state laws are preempted when they conflict with federal law." *Arizona*, 567 U.S. at 399. Conflict preemption applies "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" not just where "compliance with both federal and state regulations is a physical impossibility." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) and *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963)). Regulations, treaties, and executive agreements—no less than statutes—may create preemptive conflicts with state law. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 874 (2000) (regulations preempted state negligence suit); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 416 (2003) (executive agreements).

A.      **Field Preemption Bars Plaintiffs' Claims, Because States May Not Regulate in the Field of Export Controls**

As the Constitution itself reflects, "[p]ower over external affairs is not shared by the States; it is vested in the national government exclusively." *United States v. Pink*, 315 U.S. 203, 233 (1942). The Supreme Court has recognized this division of labor in its field-preemption precedents, which foreclose Plaintiffs' claims.

1.      **State Law May Not "Take a Position on a Matter of Foreign Policy with No Serious Claim to be Addressing a Traditional State Responsibility"**

In general, courts have found field preemption in cases where state law impermissibly interfered with foreign policy. A state law that "take[s] a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility" may be preempted,

9

regardless of "whether the National Government had acted and, if it had, without reference to the degree of any conflict." *Garamendi*, 539 U.S. at 419 n.11.  This rule derives from *Zschernig v. Miller*, 389 U.S. 429 (1968), in which the Supreme Court struck down an Oregon law that prohibited non-resident aliens from inheriting property if that property might be "confiscat[ed]" by their home government.  *Id.* at 430–31.  Though this statute did not conflict with any federal law, it was preempted because it required sensitive assessments into "the actual administration of foreign law," the "credibility of foreign diplomatic statements" and "speculation" about whether these foreign laws were applied equally as to all citizens of the foreign nation.  *Id.* at 435.  Inquiries like these necessarily "affect international relations in a persistent and subtle way," and therefore "adversely affect" the ability of the federal government to handle foreign affairs.  *Id.* at 440–41.

Courts applying *Zschernig* have found a variety of state laws that intrude on foreign relations preempted.  For example, in *National Foreign Trade Council v. Natsios*, 181 F.3d 38, 52 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000), the First Circuit held that the Constitution's assignment of primacy in foreign relations to the federal government preempted a state law imposing sanctions on Burma.  The Court explained that "*Zschernig* stands for the principle that there is a threshold level of involvement in and impact on foreign affairs which the states may not exceed"; because the Massachusetts law had "more than an incidental or indirect effect in foreign countries," it was preempted.  *Id.* at 52.  (The Supreme Court later affirmed the First Circuit's decision, but on conflict-preemption grounds.  *See infra* § IV(B).)  The Ninth Circuit has derived a two-part test from these precedents, finding preemption if a state law "[1] intrudes on the field of foreign affairs

[2] without addressing a traditional state responsibility." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012).

Regardless of the precise formulation of the *Zschernig* standard, Plaintiffs' Texas-state tort claims are preempted. Those claims severely "intrude[] on the field of foreign affairs." *Id.* at 1072. Courts have repeatedly recognized that sanctions and export controls are inherently instruments of foreign affairs, *see, e.g.*, *Crosby*, 530 U.S. at 380–81, which perform that function by restricting foreign commerce, *see Natsios*, 181 F.3d at 52. The regulations governing export of the semiconductors at issue in these cases—the EAR—"fall in the core of Executive and Legislative Branch expertise in the areas of national security and foreign affairs." *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 770 (D.C. Cir. 2022). They also reflect the political branches' attempt to carefully balance multiple national security imperatives, including the competitiveness of critical domestic industries. *See* 50 U.S.C. § 4812(b). Plaintiffs, meanwhile, expressly style their claims as attempts both to enforce violations of export controls laws—confirming that Plaintiffs' claims seek to police the same sphere of conduct—and to expand those laws' scope by superimposing additional state-tort-based obligations. (*See infra* § IV.B.) This would directly affect what U.S. companies are allowed to sell to foreign countries and under what circumstances—manifestly intruding on foreign affairs and having more than an "incidental or indirect effect in foreign countries." *Natsios*, 181 F.3d at 52.

Plaintiffs' state tort claims also do not "address[] a traditional state responsibility." *Movsesian*, 670 F.3d at 1072. The federal government has policed exports in service of foreign policy since the Founding. (*Supra* § II(D).) That Plaintiffs have pleaded their claims under state common law does not by itself put the case in an area of "traditional state responsibility"; *Zschernig* itself concerned trusts-and-estates law. 389 U.S. at 431. In any case, Plaintiffs build

11

their state tort claims on U.S. export controls laws and foreign policy pronouncements, identifying those laws and policies as the source of Defendants' duty.  (*Supra* § II(B).)  Export-controls and foreign policy are traditionally—indeed, exclusively—federal, not state, responsibilities.  *Crosby*, 530 U.S. at 380–81.

### 2. Through Export-Control Laws and the EAR, the Federal Government Has Preempted the Field of Export Controls

Congress and the Executive Branch have also preempted the field of export controls by enacting detailed statutory and regulatory schemes in an area of core federal interest.  *See Arizona*, 567 U.S. at 400; *Hines*, 312 U.S. at 64.  In *Arizona*, the Supreme Court found that Arizona state laws governing alien registration were preempted, because federal statutes set forth a "complete system for alien registration" that "struck a careful balance."  567 U.S. at 400.  The federal scheme reflected a "single integrated and all-embracing system" that "touched on foreign relations" and therefore "did not allow the states to 'curtail or complement' federal law or to 'enforce additional or auxiliary regulations.'"  *Id.*; *accord Hines*, 312 U.S. at 64 (same).

Federal export-control laws and regulations also set forth a "complete system" regarding the export of goods to foreign countries, striking a "careful balance" and making it inappropriate for states to "curtail or complement" those measures.  *Id.*  By enacting both IEEPA and ECRA, Congress gave the President exclusive discretion over the imposition of sanctions, export requirements, and the enforcement of those rules.  50 U.S.C. § 1701; *id.* § 4812.  Whenever Congress vests enforcement authority in the Executive Branch, the Executive Branch presumptively possesses the responsibility to exercise discretion, "balancing a number of factors which are peculiarly within its expertise."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

The EAR—like the federal alien-registration schemes addressed in *Arizona* and *Hines*—preempts the field, prohibiting state regulation of export controls.  Where, as here, "Congress has

12

entrusted an agency"—or the President directly—"with the task of promulgating regulations to carry out the purposes of a statute," those regulations, like statutes, can preempt state law from the field. *R.J. Reynolds Tobacco Co. v. Durham Cnty., N.C.*, 479 U.S. 130, 149 (1986). And the EAR reflect preemptive intent: the EAR recognize that "for national security and foreign policy reasons," federal agencies promulgating export controls regulations "try to minimize overlapping jurisdiction." 15 C.F.R. § 734.2(a)(2). That is significant evidence of preemptive intent. The federal government itself tries to avoid overlapping *federal* regulatory schemes; it makes no sense that it would then permit states to graft fifty additional overlapping regulatory schemes (or more, based on fact-specific applications of state tort law). In addition, the EAR identify the only other regulatory schemes it expects regulated entities to comply with: (1) the control programs of "other agencies," *id.* § 734.2(a)(2); and (2) foreign legal requirements, *id.* § 734.12. State law is nowhere to be found.

In addition, the EAR are structured as a "harmonious whole." *Arizona*, 567 U.S. at 401. The EAR identify particular products that are subject to their terms, then impose an intricate set of requirements for export that vary based on destination and type of product. 15 C.F.R. §§ 734.2(a)(1), 738.2, 738.3. In some cases, the EAR impose a total ban on export of certain items to certain countries. *See id.* Part 746. In others, they permit export under defined circumstances. *See generally* 15 C.F.R. § 738.4. Still in others, they allow regulated entities to obtain export licenses. *Id.* This scheme strikes a "careful balance" and leaves no room for supplemental state regulation—much less under a sweeping common-law negligence scheme. *Arizona*, 567 U.S. at 401.

Plaintiffs' claims impermissibly use state law to impose export-control requirements in a field the federal government exclusively occupies.

### B.      Plaintiffs' Tort Theories Conflict with Federal Law

Even if the Court does not find field preemption, conflict preemption requires dismissal because Plaintiffs' tort theories conflict with federal law.  As discussed above, foreign affairs, international trade, and export controls are areas of not just traditional, but *exclusive*, federal regulation—and must "be left entirely free from local interference."  *See Hines*, 312 U.S. at 63. For that reason, a "conflict" between state and federal law in these areas "need not be as sharp" for there to be preemption.  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988).

### 1.      Plaintiffs Cannot Use State Law to Enforce Federal Laws, Undermining the President's Authority

The Supreme Court has repeatedly held that states may not use state law to enforce and punish violations of federal law without creating impermissible conflicts.  That rule dooms Plaintiffs' claims here.  In *Arizona*, for example, the Court considered an Arizona law that authorized arrests for suspected violation of federal immigration laws—specifically, where a state law-enforcement officer had probable cause to believe a person was "removable from the United States."  567 U.S. at 407.  The Court held that this conflicted with federal immigration law and was preempted.  *Id.* at 409.  The Court pointed to the fact that "[t]he federal statutory structure instructs when it is appropriate to arrest an alien during the removal process."  *Id.* at 407.  That structure contemplated that Executive Branch officials would "exercise discretion" in deciding who to arrest for immigration detention—including by electing *not to arrest* certain individuals.  *Id.* at 407.  The Arizona statute deprived the Executive Branch of the discretion Congress had given it, thereby "violat[ing] the principle that the removal process is entrusted to the discretion of the Federal Government."  *Id.* at 409.  The need for executive discretion was especially important because removal decisions "touch on foreign relations and must be made with one voice."  *Id.*  Permitting states to exercise authority in that domain "without any input

14

from the Federal Government about whether an arrest is warranted in a particular case . . . would allow the State to achieve its own immigration policy," creating a preemptive conflict. *Id.* at 408

The same reasoning applied to and preempted state laws imposing international sanctions in *Crosby*, 530 U.S. at 380. There, affirming the First Circuit's opinion discussed above, the Supreme Court held that federal sanctions preempted a Massachusetts law that prohibited granting state contracts to companies doing business with Burma. *Id.* The Court reasoned that the President had unilateral authority to waive or terminate international sanctions, reflecting a congressional decision to give the President "as much discretion to exercise economic leverage . . . as our law will admit." 530 U.S. at 375–76. That statutory scheme made it "implausible" that Congress would also be "willing to compromise [the President's] effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary Presidential action." *Id.* at 376. The state law imposing penalties on businesses with ties to Burma created a preemptive conflict both because it denied the President this congressionally provided discretion, and because it undermined his ability "to speak for the Nation with one voice in dealing with other governments." *Id.* at 376, 381; *see also Garamendi*, 539 U.S. at 423–24 (same, as to California's insurance statute to aid Holocaust victims).

The Court has reached the same conclusion in areas not touching on foreign relations. For example, in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), the plaintiffs claimed that defendants defrauded the FDA by failing to provide accurate information in device-approval submissions. 531 U.S. at 347–49. The Court held that federal law preempted those claims, because "the federal statutory scheme amply empower[ed] the FDA to punish and deter fraud against [it]" and allowing private state-law claims would "skew[]" the "somewhat delicate

15

balance of statutory objectives" that the FDA used its enforcement authority to achieve. *Id.* at 348. For the same reasons, the Court held that a state law prohibiting the state from contracting with companies found to violate federal labor law was preempted. *Wisc. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 288 (1986). The state law "function[ed] unambiguously as a supplemental sanction for violations of" federal law and, as a consequence, "incrementally diminishe[d] the [NLRB's] control over enforcement" of federal labor law. *Id.* That diminishment of control encroached on the Executive Branch's "*exclusive authority* and *absolute discretion* to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974) (emphasis added); *see also United States v. Trump*, 603 U.S. 593, 621 (2024) (same).

These Supreme Court decisions foreclose Plaintiffs' tort claims. To start, Plaintiffs' claims are properly understood as state-law mechanisms to enforce and penalize violations of federal export-control laws—just like the preempted laws in *Buckman*, *Gould*, and *Arizona*. Plaintiffs' Petitions could not be clearer on this point: Plaintiffs allege that the duty of care owed by Defendants to Plaintiffs is based on U.S. "foreign policy" towards Ukraine (Pet. ¶ 69); federal "laws and regulations on exports and sanctions" governing sales of semiconductors to Iran (Pet. ¶ 83); and federal "laws and regulations on exports and sanctions," (Pet. ¶ 90). Each of these allegations precedes detailed analyses of relevant U.S. treaty negotiations or federal export-control laws regarding Iran or Russia. (*See* Pet. ¶¶ 70–112.) Plaintiffs then allege violations of these duties created by federal law. (*See*, *e.g.*, Pet. ¶ 210 & 216 (Counts 1 and 2, alleging breached duties related to "compliance and export-control systems"); Pet. ¶ 222 (Count 3, alleging "Defendants violated U.S. export-control and sanctions regulations"); Pet. ¶ 226 (Count 4, alleging Defendants "fail[ed] to implement effective compliance measures").) Plaintiffs' fraudulent-misrepresentation claim (Count 7), just like the claim in *Buckman*, alleges that

16

Defendants defrauded a federal agency, eventually leading to Plaintiffs' injuries.  (*See* Pet. ¶ 247.)  531 U.S. at 347–49.  Federal law acts as a predicate to these state law claims.  *See Arizona*, 567 U.S. at 407 (state law triggered by federal removability); *Buckman*, 531 U.S. at 347–49 (state tort duty to disclose allegedly derived from federal statutes).

As in *Buckman* and *Arizona*, the federal agencies tasked with implementing federal export-control laws have ample authority to enforce them and require discretion in carrying out that authority.  Federal export-control laws authorize the President to "investigate" and seek both civil and criminal penalties for violations of regulations and licenses issued pursuant to that authority.  *See* 50 U.S.C. § 1702 (investigate); *id.* § 1705 (seek penalties); *id.* § 4820 (enforce). Here, Congress went even further in its grant of authority to the Executive Branch than it did in *Buckman* or *Arizona*: Congress gave the President sole authority with respect to altering sanctions.  *Id.* § 1701; *id.* § 4812.  This reflects the need for "the President to speak for the Nation with one voice in dealing with other governments."  *Crosby*, 530 U.S. at 381; *Arizona*, 567 U.S. at 409.  State laws that interfere with or skew this enforcement—like the tort claims here—are preempted.

### 2.     Plaintiffs Cannot Impose Export-Control Requirements that Differ from Federal Requirements

To the extent Plaintiffs' claims do *not* exactly track federal law, that strengthens the case for conflict preemption.  "Sanctions are drawn not only to bar what they prohibit but to allow what they permit."  *Crosby*, 530 U.S. at 380.  And "inconsistency" in sanctions "undermines" Congress's "calibration of force."  *Id.*  Just as the aspects of the Massachusetts law that diverged from federal sanctions policy created a conflict in *Crosby*, so do any greater export-control obligations Plaintiffs would have imposed on Defendants under state tort law.  *Id.*  That is true even if both state and federal law share the same asserted goal of protecting Ukrainian civilians.

17

As in *Crosby*, "[t]he fact of a common end hardly neutralizes conflicting means, and the fact that some companies may be able to comply with both sets of [export-control obligations] does not mean that the state [law] is not at odds with achievement of the federal decision about the right degree of pressure to employ." *Id.* at 379–80.

The Supreme Court has repeatedly held that federal law preempts state tort suits that impose greater burdens on federally regulated entities, even in areas far less sensitive than export controls. In *United States v. Locke*, 529 U.S. 89, 116 (2000), for example, the Supreme Court held that state regulations governing oil tankers were preempted by federal statutes on the same subject because the state laws imposed additional obligations on regulated entities. The Court reached the same result in *Geier v. American Honda Motor Co.*, 529 U.S. 861, 865 (2000), even though *Geier*—unlike *Locke* or *Crosby*—concerned an area of undisputed traditional state regulation. There, the Court held that state defective-design suits against auto manufacturers were preempted because they would have required auto manufacturers to introduce more burdensome safety measures than federal regulators had mandated. *Id.*

Plaintiffs' core theory of liability confirms that these claims could impose additional substantive obligations on Defendants—above and beyond what federal law requires. For example, federal law prohibits Defendants from exporting "dual-use" products, like the ones at issue here, only if they have "knowledge . . . that the item is intended, entirely or in part, for a 'military end use' in Russia or "Russian 'military end user.'" 15 C.F.R. § 744.21(a)(2). Similarly, selling a "dual-use" product to an otherwise permitted customer—including a non-military entity abroad—that in turn sells it to a Russian military end-user is unlawful under federal law only if the seller *knows* that the ultimate end-user is a Russian military entity. *Id.* Yet Plaintiffs assert Defendants can be liable on a *negligence* theory—which does not require

18

actual knowledge or even awareness of a high probability that an adverse event will occur. *Compare Mullins v. McWhirte*r, 724 S.W.3d 571, 583 (Tex. App.—Eastland 2025) (negligence requires evidence only of what a defendant "should have known") *with* 15 C.F.R. § 772.1 (EAR definition of knowledge).  Plaintiffs allege that Defendants breached their duty of care by, for example, failing to conduct adequate "due diligence" or "failing to take reasonable steps to prevent foreseeable misuse of their products in weapons systems used against civilians."  (Pet. ¶ 211.)

Plaintiffs' liability theories go beyond federal export-control laws in other ways.  For example, Plaintiffs seek to impose obligations related to "the *design, implementation, marketing*, and sale of semiconductor components" and to enforce duties of disclosure not just to federal regulators, but to "end-users[] and other entities that would have halted or prevented the prohibited transaction."  (Pet. ¶¶ 210, 247 (emphasis added).)  This would impose greater obligations on Defendants' export-control practices than federal law requires, *see Crosby*, 530 U.S. at 380, and would threaten to undermine Congress's recent commitment to the U.S. semiconductor industry, *see, e.g.*, CHIPS and Science Act of 2022, Pub. L. 117–167, 136 Stat. 1366 (Aug. 2022).  In addition, Plaintiffs' state tort claims impose conflicting remedies. Congress placed a cap of $250,000 on civil penalties for violations of the federal export-control laws.  50 U.S.C. § 1705.  Texas-state tort claims have no similar cap.  Where "Congress made a deliberate choice not to impose" certain penalties, state laws imposing those penalties "interfere with the careful balance struck by Congress."  *Arizona*, 567 U.S. at 405–06; *see, e.g.*, *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1247 (10th Cir. 2006); *Eller v. Trans Union LLC*, No. 09-CV-0040-WJM-KMT, 2012 WL 786283, at *4 (D. Colo. Mar. 9, 2012).

19

## V.    PLAINTIFFS' CLAIMS FAIL AS PLEADED, UNDER TEXAS LAW

Even if Plaintiffs could sidestep both field preemption and conflict preemption, their claims would fail as pleaded, under Texas law.

### A.    Plaintiffs Do Not Plead Facts Essential to Causation (All Counts)

At the outset, all of Plaintiffs' claims fail for lack of allegations plausibly establishing causation.  Plaintiffs have plausibly pleaded neither (1) that any particular Defendant's semiconductor was in the weapon that caused their injuries (much less that Mouser Electronics distributed that specific semiconductor) nor (2) that an export-control violation by any Defendant caused their injuries.  Instead, Plaintiffs rest on the assertion that, based on unadorned "information and belief," Defendants' products were found in weapons used in specific attacks that injured or killed Plaintiffs.  (Pet. ¶¶ 14, 184.)  This is insufficient.

First, Plaintiffs cannot proceed without facts plausibly connecting a Defendant's specific product (or a Mouser shipment of a product) to the specific device Russia used to injure them.  Texas courts apply analogous causation principles in product-liability cases: "A fundamental principle of traditional products liability law is that the plaintiff must prove that the defendants supplied the product which caused the injury."  *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex. 1989) (dismissing negligence claim).  This is because "causation is a required element" of tort claims, including negligence.  *Williams v. Wal-Mart Stores Texas LLC*, No. 4:24-cv-00583-P, 2024 WL 4668556, at *2 (N.D. Tex. Nov. 4, 2024).  Without "non-conclusory allegations that any one" Defendant is "responsible for" a product that caused Plaintiffs' injuries, their claims must be dismissed.  *Id.* (dismissing negligence claims); *see also Rodriguez v. Xerox Bus. Servs, LLC*, No. EP-16-CV-00041-FM, 2017 WL 3023213, at *4 (N.D. Tex. Mar. 27, 2017) (complaint dismissed where plaintiff "pleads no specific facts linking any act or omission by Jones to the injury she suffered").

20

The only thing connecting Defendants' semiconductors to the specific weapons that injured Plaintiffs is "information and belief"—but Plaintiffs' own allegations make that "belief" implausible.  (Pet. ¶¶ 14, 184.)  A court is permitted to rely on "documents incorporated into the complaint by reference[.]"  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).  And a pleader may be "defeated . . . by his own exhibits" if he "has pleaded too much and has refuted his own allegations by setting forth the evidence relied upon to sustain them."  *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940); *accord United States v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004).

The sources Plaintiffs rely on reflect that Russian missiles and drones contain semiconductors from a variety of manufacturers—not just Defendants—and from at least eleven different countries (the U.S., China, Japan, Taiwan, France, Switzerland, Germany, Canada, South Korea, the U.K., and the Netherlands).  (*See* Pet ¶¶ 151, 157 (citing Olena Bilousova, Nataliia Shapoval & Vladyslav Vlasiuk, *Working Group Paper #13: Strengthening Sanctions on Foreign Components in Russian Military Drones*, Int'l Working Grp. on Russian Sanctions (Aug. 23, 2023)[3] and Royal United Services Institute, *Silicon Lifeline: Western Electronics at the Heart of Russia's War Machine - Interactive Summary* (last visited Mar. 20, 2026) ("RUSI")[4].)  TI, AMD, and Intel are not even the only relevant manufacturers in the U.S.; Plaintiffs' sources identify others, including Analog Devices, Microchip Technology, Maxim Integrated, Onsemi (formerly ON Semiconductor), and Micron Technology.  (Pet. ¶ 157 (citing RUSI).)  As a result,

---

[3]https://sanctions.kse.ua/wpcontent/uploads/2023/09/sanctions_workingbgroup_drones_final4.pdf

[4] https://www.rusi.org/explore-ourresearch/publications/special-resources/silicon-lifeline-western-electronics-heart-russias-warmachine/interactive-summary

21

Plaintiffs' allegations "do not permit the court to infer more than the *mere possibility* of misconduct." *Ashcroft*, 556 U.S. at 678 (emphasis added).

Second, the Petitions lack plausibly pleaded facts connecting any negligence or export-control violation to Plaintiffs' injuries. Plaintiffs' theory of liability is that certain Russian weapons contained products manufactured or distributed by one or more Defendants in negligent or intentional violation of U.S. export-control regulations. (Pet ¶¶ 7, 132, 222–23.) But there are numerous ways semiconductors could be found in Russian munitions without any negligence or export-control violations on the part of any Defendant—and Plaintiffs pleaded no facts to support their "belief" that such a violation led to their injuries.

Again, Plaintiffs' own factual allegations demonstrate why their claims cannot be sustained. Plaintiffs own sources show that many Russian weapons at sue in these cases use semiconductors manufactured when sales to Russia were *legal*. (Pet. p. 68 (citing Reuters, *As Russian missiles struck Ukraine, Western tech still flowed* (Aug. 8, 2022)[5]); *id.* ¶ 157 (citing RUSI); *id.* Ex. A p. 12 (citing The Insider, *U.S. Parts Routed Via Shell Networks* (Jan. 25, 2023)[6]).) Export-control rules broadly prohibiting semiconductor shipments to Russia are relatively recent; it was only in February 2022 that BIS "expanded the" EAR to "impose new export controls on advanced computing integrated circuits, computer commodities containing such integrated circuits, and certain semiconductor manufacturing items." (Pet. ¶ 101.) And in pleaded "examples of the Defendants' components" found in past analyses of specific Russian munitions, Plaintiffs identify semiconductors allegedly manufactured in July 2018 (Pet. p. 58), October 2020 (Pet. p. 60), and December 2020 (*id.*). Beyond that, the Petitions have significant

---

[5] https://www.reuters.com/investigates/specialreport/ukraine-crisis-russia-missiles-chips/

[6] https://theins.ru/en/politics/258850

22

gaps. In prior analyses of Russian munitions, Plaintiffs identify *no* semiconductors allegedly manufactured by TI in or after February 2022. (*See* Pet. ¶ 167.) They similarly identify *no* semiconductors allegedly manufactured by Intel after February 2022 in KH-101 missiles (Pet. pp. 56–57) or Shahed-131 drones (Pet. p. 60–61). Indeed, for Shahed-131 drones, *none* of the semiconductors Plaintiffs identify from Intel, AMD, or TI is alleged to have been manufactured after mid-2020. (Pet. pp. 60–61.) Given these gaps, the Petitions lack "factual content that allows the court to draw the reasonable inference" that export-control violations led to *each* (or any) Defendant's products being in *each* specific attack at issue. *Iqbal*, 556 U.S. at 678.

Without pleading facts to demonstrate plausibly that (1) a semiconductor manufactured or distributed by a Defendant was used in the specific Russian weapon that caused a Plaintiff's injury and (2) the semiconductor made its way into that Russian weapon because a Defendant negligently or intentionally violated an export restriction, Plaintiffs have not adequately pleaded causation. Here, as in other cases courts have dismissed, Plaintiffs "do not differentiate among the [defendants]" and do not plead facts to demonstrate "a causal relation between any of the [defendants'] . . . operations and any of the [plaintiffs'] damages, much less that any negligent act was a substantial cause thereof." *In re Great Lakes Dredge & Dock Co. LC*, 624 F.3d 201, 214 (5th Cir. 2010). Their allegations, even taken at face value, "do not rule out the possibility that Plaintiffs' alleged . . . injuries resulted from another actor's actions at a different place." *Johnson v. Tyson Foods, Inc.*, 580 F. Supp.3d 382, 388 (N.D. Tex. 2022).

**B.    U.S. Export Controls Create No Private Right of Action, Defeating Negligence-Per-Se, Conspiracy, and Joint-Enterprise Claims (Counts 3, 5, 8)**

Several of Plaintiffs' claims also impermissibly rest on purported violations of federal export-control laws that do not create any private right of action. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v.*

23

*Sandoval*, 532 U.S. 275, 286 (2001); *Karahalios v. Nat'l Fed'n of Fed. Emps. Loc. 1263*, 489 U.S. 527, 533 (1989).  But the export-control laws supporting Plaintiffs' negligence-per-se (Count 3), conspiracy (Count 5) and joint-enterprise (Count 8) claims have no private rights of action; they authorize enforcement only by the federal government, through criminal or civil penalties.  *See* 31 C.F.R. §§ 560.701, 589.701; 50 U.S.C. § 4819; 22 U.S.C. § 2778(c).  Nothing in the text or structure of federal export-control laws demonstrates Congress's intent to create a private right of action—and the Fifth Circuit, analyzing the Export Administration Act of 1979, has concluded that there is none.  *Adams v. Alcolac, Inc.*, 974 F.3d 540, 544 (5th Cir. 2020). Plaintiffs recognize the absence of a federal private cause of action, but not the effect of this concession on their tort claims.  (Pet. ¶ 112.)

### 1.   Statutes Without a Private Right of Action Cannot Support a Negligence-Per-Se Claim (Count 3)

The absence of a private right of action defeats Plaintiffs' negligence-per-se claim, which rests exclusively on allegations that "Defendants violated U.S. export-control and sanctions regulations and Executive Orders."  (Pet. ¶¶ 222–23.)

"Under Texas law, when a legislative body declines to provide for an individual private right of action in a statute and instead provides a comprehensive regulatory scheme with limited private remedies, that statute will not be an appropriate basis for a negligence per se claim." *Armstrong v. Sw. Airlines Co.*, No. 3:20-CV-3610-BT, 2021 WL 4391247, at *3 (N.D. Tex. Sept. 24, 2021) (citing *Smith v. Merritt*, 940 S.W. 2d 602, 607–08 (Tex. 1997)); *accord  Walters v. Blue Cross & Blue Shield of Tex., Inc.*, No 21-CV-981-L, 2022 WL 902735, at *5 (N.D. Tex. Mar. 28, 2022); *Brighthouse Life Ins. Co. v. Daboub*, 577 F. Supp. 3d 504, 526 (N.D. Tex. 2021).  To do otherwise would "disturb the Legislature's regulatory scheme by judicially

24

recognizing a cause of action 'not contemplated by the statute.'" *Armstrong*, 2021 WL 4391247 at *4 (quoting *Reeder v. Daniel*, 61 S.W.3d 359, 364 (Tex. 2001)).

The Texas Supreme Court and federal courts applying Texas law have consistently dismissed negligence-per-se claims based on statutes lacking a private right of action.[7]  And, more broadly, the Texas Supreme Court "treads cautiously when deciding whether to recognize a new tort," *Trevino v. Ortega*, 969 S.W.2d 950, 951 (Tex. 1998); it has "created a new duty by applying negligence per se on only *one occasion*," *Martinez v. Walgreen Co.*, 935 F.3d 396, 403 n.33 (5th Cir. 2019) (emphasis added).  Given the complexity of export-control regulations and Congress's intent not to create any private right of action, this should not be the second occasion.

### 2.   Absent Any Underlying Tort, Plaintiffs' Conspiracy and Joint-Enterprise Claims Also Fail (Counts 5, 8)

Federal export-control laws also cannot provide a basis for Plaintiffs' conspiracy (Count 5) and joint-enterprise (Count 8) claims—both of which require an underlying tort.  Plaintiffs plead that Defendants "conspired . . . to evade and/or violate U.S. export laws" (Pet. ¶ 230) and formed a joint enterprise for the "intentional circumvention of export-control laws" (Pet. ¶¶ 251–52.)  But these claims require an independent actionable tort.  *See Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141–42 (Tex. 2019); *Naylor v. Crush 72, Inc.*, No. 4:24-CV-634-Y, 2025 WL 1250917, at *4 (N.D. Tex. Apr. 24, 2025).  Violations of U.S. export-control laws

---

[7] *See In re New Era Enters. Inc. Data Incident Litig.*, No. H-25-732, 2026 WL 303547, at *12 (S.D. Tex. Feb. 4, 2026) (Federal Trade Commission Act and Gramm-Leach-Bliley Act); *Lowman v. Enter. Fin. Grp., Inc.*, No. 3:24-CV-02752-L, 2025 WL 2778380, at *3 (N.D. Tex. Sep. 30, 2025) (Federal Trade Commission Act and Texas Identity Enforcement and Protection Act); *Smith v. Am. Pain & Wellness, PLCC*, 747 F. Supp. 3d 989, 1004 (E.D. Tex. 2024) (Federal Trade Commission Act); *In re ESO Solutions, Inc. Breach Litig.*, 23-CV-1557-RP, 2024 WL 4456703, at *11 (W.D. Tex. July 30, 2024) (HIPAA and Federal Trade Commission Act); *Walters*, 2022 WL 902735, at *6 (HIPAA and Texas Medical Records Privacy Act); *Armstrong*, 2021 WL 4391247, at *4 (federal Air Carrier Access Act); *Merritt*, 940 S.W.2d at 607 (Texas Alcohol Beverage Code); *Reeder*, 61 S.W. 3d at 362 (Texas Alcohol Beverage Code).

25

cannot be the underlying tort because those laws do not create a private right of action.  *See*

*Adams*, 974 F.3d at 544; *SCI Tex. Funeral Servs., Inc. v. Hijar*, 214 S.W. 3d 148, 154 (Tex.

App.—El Paso 2007, pet. denied).

This same rule defeats Plaintiffs' damages allegations for these derivative-liability

claims.  The damages element of a civil conspiracy "refers not to the entire conspiracy itself but

to some tortious act committed by a co-conspirator pursuant to the conspiracy."  *Agar*, 580 S.W.

3d at 142.  It is insufficient to allege damages "proximately caused by the conspiracy itself"; a

plaintiff must allege damages caused by an underlying tortious act.  *Id*. at 141–42.  Again, the

export-control laws provide no such tort.  *See Adams*, 974 F.3d at 544.  To the extent Plaintiffs

allege that the Russian military committed the tortious act by launching attacks against them,

then Plaintiffs would have to allege facts showing that Defendants conspired *with the Russian*

*military and* agreed "to the injury to be accomplished"—namely, the attacks on Plaintiffs.  *Chu*

*v. Hong*, 249 S.W.3d 441, 446 (Tex. 2008).  Plaintiffs do not and cannot allege that.  (*See* Pet.

¶¶ 229–34.)

The Fifth Circuit reached a materially identical conclusion in *Adams*.  974 F.3d at 542.

There, U.S. military veterans injured by the Iraqi military's use of mustard gas during the Gulf

War sued a company that exported a chemical that could be used to produce that gas.  *Id.*  The

veterans alleged that Alcolac conspired with the Iraqi government to violate the Export

Administration Act ("EAA").  *Id.*  The Fifth Circuit ultimately held that a violation of the EAA

could not be the "underlying tort claim that caused [plaintiffs] damages," because "it is

undisputed that the EAA does not provide a private right of action."  *Id.* at 545.  The Fifth Circuit

also rejected plaintiffs' conspiracy claim that contended that the "EAA violations led to Iraq's

26

use of mustard gas, which they claim constituted battery," because plaintiffs had no evidence that Alcolac "conspired to commit that battery." *Id*.

Here, too, a violation of federal export-control laws cannot be the underlying tort claim that caused Plaintiffs damages, and Plaintiffs do not (and could not) allege that Defendants conspired or formed a joint enterprise with the Russian military to attack Ukrainian civilians. They allege only that it was foreseeable that the Russian military could use Defendants' products. (Pet. ¶ 233). That is insufficient to state a claim for civil conspiracy or joint enterprise. *Adams*, 974 F.3d at 544 (citing *Chu*, 249 S.W.3d at 446).

### C.    Plaintiffs Plead No Cognizable Duty Supporting Negligence or Gross Negligence Claims (Claims 1, 2, 3, 4)

Plaintiffs also fail to plead a cognizable duty of care supporting their negligence claims. Plaintiffs devote nearly 20 pages of their Petitions to detailing U.S. foreign policy and export-control laws that they allege created "a common-law duty of care" Defendants owed to Plaintiffs. (Pet. ¶¶ 69-112.) Whether a federal statute creates a common-law duty of care is a question of state law. *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 253 (5th Cir. 2008).

Texas courts have rejected similar attempts to create a common-law duty of care based on federal statutes lacking a private right of action. *Marlin v. Moody Nat'l Bank N.A.*, No. H-04-4443, 2006 WL 2382325, at *7 (S.D. Tx. Aug. 16, 2006); *Mortberg v. Litton Loan Servicing, L.P.*, No. 4:10-CV-668, 2011 WL 4431946 (E.D. Tex. Aug. 30, 2011). In *Marlin*, for example, the plaintiff alleged that a bank negligently violated the Bank Secrecy Act by failing to adequately investigate and prevent fraudulent transactions. The court dismissed the claim, holding that the bank's "obligation under that statute is to the government rather than some remote victim," and because the statute "does not create a private right of action," it "therefore, does not establish a standard of care." *Marlin*, 2006 WL 2382325 at *7. Here too, export-

27

control laws impose obligations to the federal government; companies must obtain export licenses from BIS and provide BIS with records reflecting the known end-users of exported products. But those laws impose no obligation to individuals who may be harmed by users of exported products (or diverted exported products). To recognize such an obligation here would circumvent the intent of Congress and "evade the principle that no private right of action exists." *Niss v. Nat'l Ass'n of Sec. Dealers, Inc.*, 989 F. Supp. 1302, 1309 (S.D. Cal. 1997).

More generally, Texas law does not recognize a "general duty to control others," *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 504 (Tex. 2017), or "to protect others from third-party criminal acts," *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 12 (Tex. 2008). Plaintiffs have alleged nothing to justify a departure from these basic rules: aside from federal law, they plead only a handful of general pronouncements by the Texas governor and Dallas officials condemning the war in Ukraine. (Pet. ¶¶ 113–18.) They do not identify any special relationship between Defendants and Plaintiffs, Russia, or Ukraine. *See Pagayon*, 536 S.W.3d at 504; *Restatement (Second) of Torts* § 315. They do not allege that they were injured because Defendants manufactured or distributed a defective product. *Cf. Allen v. Walmart Stores, L.L.C.*, 907 F.3d 170, 182 (5th Cir. 2018). And they do not allege any facts to plausibly demonstrate that Defendants controlled the activities of third parties who installed their products in weapons, much less that Defendants controlled the Russian military's use of those weapons. *See Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 526 (Tex. 1990).

Policy considerations also counsel against creating a duty here. *See Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 145 (Tex. 2022). Plaintiffs cannot deny the social utility of manufacturing and distributing semiconductors for myriad lawful, productive uses. Plaintiffs also cannot demonstrate—and the sources cited in their Petition refute—that Defendants can

28

control the actions of Russia or of those who build weapons using semiconductors.  To the contrary, given the large number of semiconductor manufacturers and the numerous distribution and diversion channels referenced in Plaintiffs' cited sources, there is no basis to believe that imposing liability on Defendants would lessen Russian aggression or its ability to acquire weapons.  But imposing liability on manufacturers whose products are later used in weapons— based solely on alleged export violations—would effectively make them insurers against such aggression worldwide.  There is no Texas authority for imposing such an impossible duty on American corporations.  *See Hou. Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580, 588 (Tex. 2023) (declining to impose new duty); *In re Luminant Generation Co. LLC*, 711 S.W.3d 13, 24–27 (Tex. App.—Houston 2023) (same).

> **D.      Plaintiffs' Allegations Are Factually and Legally Deficient in Other Respects (Counts 5–10)**

Plaintiffs' claims are defective in other, claim-specific ways—all requiring dismissal.

***Aiding and Abetting (Count 6).***  Although titled "assisting and encouraging," Plaintiffs' allegations clarify that this is an "aiding and abetting" claim.  (Pet. ¶¶ 241–42.)  But the Texas Supreme Court has not recognized civil aiding and abetting, and a federal court "cannot recognize a claim that the Texas Supreme Court has yet to expressly adopt."  *Midwestern Cattle Mktg., LLC v. Legend Bank, N.A.*, 800 F. App'x 239, 250 (5th Cir. 2020) (dismissing Texas civil aiding-and-abetting claim); *accord In re DePuy Ortho., Inc. Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018); *Cleveland State Bank v. JPMorgan Chase Bank*, No. 4:24-CV-1600, 2025 WL 296144, at *3 (S.D. Tex. Jan. 24, 2025).

Even if Texas recognized civil aiding and abetting, Plaintiffs do not allege facts plausibly establishing its elements, including "substantial assistance."  (Pet ¶ 241(c).)  For example, Plaintiffs plead no facts that Defendants "associated themselves" with Russia's attacks or

29

"sought by their action to make [any attack] succeed." *Twitter Inc. v. Taamneh*, 598 U.S. 471, 474 (2023).  They plead no facts to show that any Defendants gave the Russian military "special treatment," or "encourag[ed], solicit[ed], or advis[ed]" Russia.  *Id.* at 498, 500.  As the Supreme Court of the United States has recognized—analyzing aiding and abetting under federal common law—a merchant "does not become liable for all criminal misuses of his goods, even if he knows that in some fraction of cases misuse will occur." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 292 (2025) (cleaned up).  "The merchant becomes liable only if, beyond providing the good on the open market, he takes steps to promote the resulting crime and make it his own." *Id.* (cleaned up).  Plaintiffs do not and cannot plead such steps.

***Fraudulent Concealment by Nondisclosure (Count 7).***  Plaintiffs also allege that Defendants fraudulently failed to disclose material facts to "regulators, intermediaries, and parties who reasonably relied on Defendants to comply with export-control laws."  (Pet ¶ 245; *accord* Pet. ¶ 247.)  Plaintiffs do not satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standard, which applies to fraudulent-nondisclosure claims.  They do not "plead with particularity that [any] Defendant owed [any] Plaintiff a duty to disclose," *Tornado BUS Co. v. BUS & Coach Am. Corp.*, No. 3:14-cv-3231-M, 2015 WL 11120584, at *5 (N.D. Tex. Dec. 15, 2015), or how that duty was breached.  Plaintiffs also group all four Defendants together, without differentiation—but "[w]hen multiple defendants are alleged to have committed fraudulent acts, a party claiming fraud must plead with sufficient particularity attribution of the alleged misrepresentations or omissions to each defendant." *Neukranz v. Conestoga Settlement Servs., LLC*, No. 3:19-CV-1681-L, 2022 WL 19518462, at *12 (N.D. Tex. Nov. 23, 2022).  "General allegations that lump all defendants together . . . do not meet the requirements of Rule 9(b)." *Id.* (cleaned up).

30

Even looking beyond Rule 9(b), Plaintiffs' fraudulent-concealment allegations fail.  A fraud-by-nondisclosure claim requires that the defendant have "a legal duty to disclose facts *to the plaintiff*," which generally requires "a confidential or fiduciary relationship" between the parties.  *Roxo Energy Co., LLC v. Baxsto, LLC*, 713 S.W.3d 404, 411 (Tex. 2025) (emphasis added).  Plaintiffs have not pleaded such a relationship, and they also do not plead other required elements: that (1) "the defendant intended to induce *the plaintiff* to take some action or refrain from acting," (2) "*the plaintiff* relied on the defendant's nondisclosure," and (3) "the plaintiff was injured *as a result of acting without [] knowledge*" of the undisclosed facts.  *E-Learning LLC v. AT&T Corp.*, 517 S.W.3d 849, 862 (Tex. App.—San Antonio 2017) (emphasis added). (*See* Pet. ¶¶ 243–249.)  Plaintiffs plead only that nondisclosure to third parties foreseeably "resulted in injury to the Plaintiffs."  (Pet. ¶¶ 243, 248.)

***Joint Enterprise (Count 8).***  Although Plaintiffs recite the elements of a joint-enterprise claim, they do not plead facts plausibly supporting them.  (*See* Pet ¶¶ 251–57.)  Not a single pleaded fact indicates, for example, that Defendants both "possessed an equal right of control over the operations of the enterprise" and "a community of pecuniary interest"—much less a "shared financial stake" that "existed specifically with respect to the unlawful export transaction at issue."  (Pet. ¶¶ 253–54.)  Plaintiffs' allegations may indicate that Defendants had business interests in common, but the allegations do not reflect any "interests in . . . activities . . . held in community" and "shared without special or distinguishing characteristics" among Defendants.  *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 528 (Tex. 2002).  Plaintiffs likewise plead no facts to show "shared financial resources, pooled funds, or joint monetary investments in the enterprise."  *Allred v. Freestone Cnty. Fair Ass'n, Inc.*, No. 07-20-00168-CV, 2022 WL 1153152, at *11 (Tex. App.—Amarillo Apr. 18, 2022); *see also Cali-Curl, Inc. v. Marianna Indus., Inc.*, No.

31

3:23-CV-320-K, 2023 WL 6452379, at *8 (N.D. Tex. Oct. 3, 2023).  The idea that Defendants had a joint "illegal enterprise" to "collaborate in the illegal export of missile-critical component parts to Russia" is implausible, and the Petitions do not plead "factual content that allows the court to draw the reasonable inference" that Defendants are "liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

***Wrongful Death and Survival (Counts 9, 10).***  Plaintiffs' wrongful-death and survival claims—under the Texas Wrongful Death Act ("TWDA") and Texas Survival Statute ("TSS")— are derivative claims, which fail because the underlying tort claims fail.  *Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 345–47 (Tex. 1992).  In addition, Plaintiff Tvistok in *Shumylo* cannot bring a TWDA claim because he or she is not a surviving spouse, child, or parent of the pleaded victim (T.T.).  Tex. Civ. Prac. & Rem. Code § 71.004(b).  And no Plaintiff can bring a claim under the TSS because they are not the relevant "estate's personal representative," and Plaintiffs have not pleaded facts showing that estate administration is unnecessary or that they are the sole heirs at law of the relatives.  *Id.* § 71.021(b); *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005); *Rodgers v. Lancaster Police & Fire Dep't*, 819 F.3d 205, 212–13 (5th Cir. 2016); *Singleton v. Harris Cty.*, 752 F. Supp.3d 672, 677–78 (S.D. Tex. 2024); *Martone v. Livingston*, No. 4:13-CV-3369, 2015 WL 9259089 at *2 (S.D. Tex. Dec. 18, 2015).

E.    **All Claims Brought by the *Tereschenko*, *Zaplyvanyi*, and *Babich* Plaintiffs Are Time-Barred.**

Finally, the Court should dismiss all claims in the *Tereschenko, Zaplyvanyi*, and *Babich* Petitions because the claims are time-barred.  In Texas, suits for personal injury "must be brought no later than two years after the day the cause of action accrues."  *Schlumberger Tech. Corp. v. Pasko*, 544 S.W.3d 830, 834 (Tex. 2018) (citing Tex. Civ. Prac. & Rem. Code § 16.003(a)).  Plaintiffs suggest that the Court should apply Ukraine's three-year statute of

32

limitations.  (*Shumylo* Pet. ¶ 208.)  But Texas law is clear: a foreign plaintiff must satisfy both Texas's two-year statute of limitations for personal-injury suits and any statutes of limitations from the location in which the injury or act occurred.  *Oubre v. Schlumberger Ltd.*, No. 3:15-CV-111, 2016 WL 5334627, at *5 (S.D. Tex. Sept. 23, 2016) (citing Tex. Civ. Prac. & Rem. Code § 71.031(a)).

An action "accrues when a wrongful act causes an injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur."  *Childs v. Haussecker*, 974 S.W.2d 31, 36 (Tex. 1998).[8]  Here, the *Tereschenko*, *Zaplyvanyi*, and *Babich* plaintiffs filed suit on December 10, 2025, more than two years after their alleged injuries on or shortly after March 22, April 28, and June 13, 2023, respectively.  (*See Tereschenko* Pet. ¶ 187; *Zaplyvanyi* Pet. ¶ 189; *Babich* Pet. ¶ 185.)

Texas's discovery rule cannot save these untimely claims.  The discovery rule is a "'narrow exception' to the legal injury rule that 'defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action.'"  *Doe v. City View Ind. Sch. Dist.*, 736 F. Supp. 3d 459, 465–66 (S.D. Tex. 2024) (citation omitted).  It does not apply when a plaintiff "in the exercise of reasonable

---

[8]  *See also Bryant v. CIT Grp./Consumer Fin., Inc.*, 303 F. Supp. 3d 515, 524 (S.D. Tex. 2018) (negligence, negligence per se, and gross negligence); *Ruiz v. Guerra*, 293 S.W.3d 706, 712 (Tex. App.—San Antonio 2009, no pet.) (wrongful death); *Nguyen v. Watts*, 605 S.W.3d 761, 793 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (aiding and abetting is a derivative tort in Texas, meaning it is subject to the statute of limitations of the underlying tort.); *Johnson v. United States*, No. 3:06-CV-1418-P, 2007 WL 9711680, at *5 (N.D. Tex. Aug. 29, 2007), aff'd, 287 Fed. Appx. 328 (5th Cir. 2008) ("[T]he general statute of limitations for a survival action in Texas is two years from the date of decedent's death."); *Agar*, 580 S.W.3d at 148 (holding that "civil conspiracy is a derivative claim that takes the limitations period of the underlying tort that is the object of the conspiracy."); *In re Tex. Dep't of Transp.*, 218 S.W.3d 74, 78 (Tex. 2007) (joint enterprise is a derivative tort in Texas, meaning it is subject to the statute of limitations of the underlying tort).

diligence should have discovered the nature of [the] injury." *McGowan v. S. Methodist Univ.*, 715 F. Supp. 3d 937, 947 (N.D. Tex. 2024) (interpreting Texas law).

Plaintiffs' own allegations undermine any reliance on the discovery rule. Plaintiffs contend that they could not have discovered sufficient facts to seek relief against Defendants until the U.S. Senate Permanent Subcommittee on Investigations' September 10, 2024 report stating that Defendants' semiconductors were found in weapons used in attacks against Ukraine. (*Tereschenko* Pet. ¶ 202; *Zaplyvanyi* Pet. ¶ 197; *Babich* Pet. ¶ 185.) But Plaintiffs themselves cite articles and other "publicly available information" dating to January 2023, reporting the same facts. (*Tereschenko* Pet. ¶ 147 n.55 (citing January 4, 2023 CNN report), Ex. A, at p. 4 (citing January 26, 2023 article, "How Russia Is Using U.S. Electronics to Attack Ukraine")). Plaintiffs also rely on a report from August 2023, which alleged that "[t]he top producers" of weapons used in Ukraine "for the first five months of 2023 were Intel, Analog Devices, Samsung, Texas Instruments, and Xilinx (AMD), with components from these manufacturers found in Russian UAVs and other military equipment." (*See Tereschenko* Pet. ¶ 154; *Zaplyvanyi* Pet. ¶ 156; *Babich* Pet. ¶ 152.) These public sources predated or shortly followed the attacks that injured the *Tereschenko*, *Zaplyvanyi* and *Babich* plaintiffs—and they provided more than sufficient facts to discover the nature of their injuries. As a result, the discovery rule does not change the relevant dates or, at best, only extends the dates to August 2023, still more than two years before Plaintiffs filed suit.

Plaintiffs' allegation that Defendants "actively concealed relevant facts" does not change this conclusion. (Pet. ¶ 196.) Texas's fraudulent concealment doctrine tolls a claim "where a defendant is under a duty to make disclosure but fraudulently conceals the existence of a cause of action from the party to whom it belongs." *Beckwith v. City of Hou.*, 790 F. App'x 568, 573 (5th

34

Cir. 2019) (per curiam).  Defendants had no duty to disclose to Plaintiffs, as set forth above.  And "[a]ny tolling afforded by the doctrine ends when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action."  *McGowan*, 715 F. Supp. 3d at 948.  Based on the same public reporting cited above, Plaintiffs had "actual knowledge" of injury-causing conduct giving rise to potential causes of action by the time the attacks occurred or shortly thereafter.  *See Doe*, 736 F. Supp. 3d at 465.  This "start[ed] the clock on the limitations period irrespective of the potential effect of [alleged] fraudulent concealment." *Hooks v. Samson Lone Star, L.P.*, 457 S.W.3d 52, 59 (Tex. 2015).

Because the *Tereschenko*, *Zaplyvanyi*, and *Babich* plaintiffs did not file suit until after the two-year statute of limitations had expired and no tolling doctrine applies, their claims are time-barred.

## VI.    CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Petitions in their entirety.

Dated: March 20, 2026

Respectfully submitted,

*L. ashley aull*

L. Ashley Aull

Gregory P. Stone*
L. Ashley Aull*
David T. Ryan*
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th  Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Fax:  (213) 687-3702
Gregory.Stone@mto.com
Ashley.Aull@mto.com

Helen E. White*

35

MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100
Fax: (202) 220-2300
Helen.White@mto.com

Jeff Tillotson
State Bar No. 20039200
TILLOTSON, JOHNSON & PATTON LLP
1201 Main St., Suite 1300
Dallas, TX 45202
(214) 382-3040
jtillotson@tillotsonlaw.com

**ATTORNEYS    FOR    DEFENDANT
INTEL CORP.**

*/s/ Eliot T. Burriss*
Eliot T. Burriss
State Bar No. 2404611
eli.burriss@faegredrinker.com
Zack M. McConnell
State Bar No. 24143181
zack.mcconnell@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH
LLP
2323 Ross Ave., Suite 1700
Dallas, TX 75201
Telephone:  (469) 357-2500
Fax:  (469) 327-0860

**ATTORNEYS FOR DEFENDANT
MOUSER ELECTRONICS, INC.**

*/s/ Thomas M. Melsheimer*
Thomas M. Melsheimer
Texas Bar No. 13922550
tmelsheimer@kslaw.com
Rex Mann
Texas Bar No. 24075509
rmann@kslaw.com
KING & SPALDING LLP
2601 Olive St., Suite 2300
Dallas, TX 75201
Telephone:  (214) 764-4600

36

Fax:  (214) 764-4601

**ATTORNEYS FOR DEFENDANT**
**TEXAS INSTRUMENTS,**
**INCORPORATED**

*/s/ Anna G. Rotman, P.C.*
Anna G. Rotman, P.C.
State Bar No. 24046761
KIRKLAND & ELLIS LLP
609 Main St.
Houston, TX 77002
Telephone: (713) 836-3600
Fax: (713) 836-3601
Email: anna.rotman@kirkland.com

Erin Nealy Cox, P.C.
State Bar No. 00794357
KIRKLAND & ELLIS LLP
4550 Travis St.
Dallas, TX 75205
Telephone: (214) 972-1757
Fax: (214) 972-1771
Email: erin.nealycox@kirkland.com

Jordan L. Greene*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-3067
Fax: (202) 389-5200
jordan.greene@kirkland.com

**ATTORNEYS FOR DEFENDANT**
**ADVANCED MICRO DEVICES, INC.**

*\*Pro hac vice*

37

## **CERTIFICATE OF SERVICE**

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's EM/ECF system on March 20, 2026, per Local Rule 5.1(e).

*/s/ L. Ashley Aull*
L. Ashley Aull


## **CERTIFICATE OF WORD COUNT AND COMPLIANCE**

I certify that the foregoing document contains 11,077 words, excluding case caption, signature block and certificates and less than 35 pages of argument.

*/s/ L. Ashley Aull*
L. Ashley Aull